

**DISTRICT OF COLUMBIA**
**PUBLIC SCHOOLS**

*Office of the Superintendent*
**Office of the General Counsel**
825 North Capitol Street, N.E., 9ᵗʰ Floor
Washington, D.C. 20002-4232
202-442-5000  Fax # 202-442-5098
*www.k12.dc.us*

**Via Facsimile: 202-742-2098**

## NOTICE TO APPEAR

**To:**         A̶n̶g̶e̶l̶a̶ G̶r̶e̶g̶o̶r̶y̶ R̶i̶v̶e̶r̶s̶

**'IN CARE OF:**    James Brown, Esq.

**FROM:**     Katherine Rodi
          DCPS Attorney Advisor
          c/o Shane Walter
          Paralegal Specialist

**DATE:**     November 23, 2005

**SUBJECT:**  NOTICE TO APPEAR AS A WITNESS IN THE MATTER RE:
          A̶n̶g̶e̶l̶a̶ G̶r̶e̶g̶o̶r̶y̶ R̶i̶v̶e̶r̶s̶

---

This is to notify you that you are required to appear as a witness at the Special Education Due Process Hearing for the above-referenced student. The hearing is scheduled for:

   **Date:**    Thursday, December 1, 2005

   **Time:**    1:00 PM

   **Place:**   Union Square
          Special Education Student Hearing Office
          825 North Capitol Street, N.E.
          8ᵗʰ Floor
          Washington, D.C. 20002-1994

The authority to compel your attendance is found in the Individuals with Disabilities Education Act (IDEA) (20 USC § 1415 (H)(2), 34 CFR 509(a)(2)) and the Rules of the Board of Education from the District of Columbia Municipal Regulations (5 DCMR § 3031.1(b)).

---

*Children First*

145

# MESSAGE CONFIRMATION

```
                                    11/23/2005  12:57
                                    ID=OFFICE OF THE GENERAL COUNSEL


 DATE      S.R-TIME   DISTANT STATION ID      MODE      PAGES   RESULT             S.C.
 11/23     00'20"     2027422098              TX        002     OK                 0000
```

11/23/2005    12:57    OFFICE OF THE GENERAL COUNSEL → 97422098                    NO.982    P001



**Office of the General Counsel**
**9th Floor**
**825 North Capitol St, NE**
**Washington, DC 20002**
**(202) 442-5000**
**Fax (202) 442-5098**

## FACSIMILE

**DATE:** 11/23/05

**TO:** James Brown, Esq.    **FAX:** 742-2098

**CO:** _____    **TEL:** _____

**FROM:** Katherine G. Rodi, Esq.
Attorney Advisor, 202-442-5167

No. Pages, Including Cover Sheet: 2

**RE:** Motion to Compel A~~____~~ G~~____~~ R~~____~~

**COMMENTS:** _____
_____
_____

### CONFIDENTIALITY NOTICE

*The information contained in this telefacsimile has been transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, and return the original message to us at the above address via first class prepaid US postage. Thank you.*

146



Office of the General Counsel
9th Floor
825 North Capitol St, NE
Washington, DC 20002
(202) 442-5000
Fax (202) 442-5098

# FACSIMILE

**DATE:** 11/23/05

**TO:** James Brown, Esq.

**FAX:** 742-2098

**CO:** _____

**TEL:** _____

**FROM:** Katherine G. Rodi, Esq.
Attorney Advisor, 202-442-5167

No. Pages, Including Cover Sheet: 2

**RE:** Motion to Compel ~~Arguita Gregory Pines~~

**COMMENTS:** _____

---

### *CONFIDENTIALITY NOTICE*

*The information contained in this telefacsimile has been transmitted by an attorney. It is privileged and confidential, intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copy of this communication is strictly prohibited. If this communication has been received in error, please notify us immediately by telephone, and return the original message to us at the above address via first class prepaid US postage. Thank you.*

---

147

wtk

T6896

1

## GOVERNMENT OF THE DISTRICT OF COLUMBIA

## DEPARTMENT OF PUBLIC SCHOOLS

## OFFICE OF STUDENT HEARINGS

- - - - - - - - - - - - - x
                                    :
In the Matter of:                   :
                                    :
A▇▇▇▇  R▇▇▇▇-G▇▇▇▇▇       :
                                    :
- - - - - - - - - - - - - x

Washington, D.C.

Friday, December 1, 2005

The above-entitled matter came on for

hearing, pursuant to notice.

BEFORE:

TERRY BANKS, Hearing Officer

APPEARANCES:

On Behalf of the Student/Parent:

MARSHALL LAMMERS, ESQ.

On Behalf of D.C. Public Schools:

CATHERINE RODI, ESQ.

[TRANSCRIPT PREPARED FROM A TAPE RECORDING.]

wtk

2

# C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Kevin Carter | 21 | 32 | 42 | 44 |
| Ms. Sonia Lee | 47 | 52 | 61 | |
| A█████ R████-G█████ | 65 | 70 | 76 | |

MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C.  20003-2802
(202) 546-6666

wtk                                                                    3

<u>P R O C E E D I N G S</u>

1

2      HEARING OFFICER BANKS: Good morning.

3      MS. PRIMES:  Good morning.

4      HEARING OFFICER BANKS:  Today is Dec 1,

5 2005, this is an Administrative Hearing for A███████

6 R██████ G████████.

'7          This hearing is being conducted in

8 accordance with the guidelines and rights

9 established by the Individuals With Disabilities

10 Education Improvement Act of 2004; the Rules of the

11 Board of Education for the District of Columbia and

12 D.C. Code Title 38.  My name is Terry Banks.  As an

13 independent Hearing Officer, I am not an employee

14 of the D.C. Public Schools.  I am not related to,

15 or an acquaintance of the Student of Parent.  I am

16 prepared to hear both parties and will act only on

17 the evidence presented during the course of this

18 hearing, in accordance with applicable laws, rules,

19 and regulations.

20          This hearing is closed to the public, the

21 matters discussed here today are confidential and

22 must be treated as such, even after the hearing is

wtk

4

1   completed.  The hearing is being recorded and

2   either party may request a copy of the disc or a

3   written transcript of the proceedings by writing to

4   the Student Hearing Office.

5        At this time, I would like for everyone to

6   identify themselves for the record.

7        MS. RODI: Catherine Rodi, Attorney Advisor

8   to D.C. Public Schools.

9        MS. LAMMERS:  Catherine Rodi, attorney for

10  the Student.

11       MS. CARTER:  Good afternoon, Kevin Carter,

12  educational advocate.

13       MR. Hill:  Mike Hill, James E. Brown and

14  Associates practicing pursuant to [unintell.]

15       HEARING OFFICER BANKS:  Good afternoon.

16  Mr. Lammers, do you waive a reading of the hearing

17  rights?

18       MR. LAMMERS:  Yeah we waive a formal

19  reading of the rights today.

20       HEARING OFFICER BANKS:  Both parties have

21  supported five-day disclosure statements.  Does

22  either party object to the introduction of the

1    other party's statement of the evidence?

2            MS. RODI:   No objections.

3            MR. LAMMERS:   I do have one objection.

4    The disclosure received November 23, contains MDT

5    or meeting notes from November 22, '05, they

6    weren't actually attached to the disclosure we

'7   received; it was only three pages..  We're not aware

8    of any meeting actually taking place on the 22nd,

9    so we would ask that or any reference to it not be

10   admitted.

11           MS. RODI:   Well, the meeting was supposed

12   to take place on the 22nd; it was canceled and

13   rescheduled and--x But you disclosed the notes that

14   he hasn't seen.

15           MS. RODI:   They were--no, because the

16   meeting happened yesterday.  Mr. Carter was at that

17   meeting.  So, but they were--the meeting was

18   supposed to occur, it did not occur, it was

19   canceled by Mr. Carter and by their client and,

20   subsequently, a meeting did not happen again until

21   yesterday.

22           HEARING OFFICER BANKS:   So, a meeting took

wtk                                                                    6

1    place yesterday?

2              MS. RODI:  Yes.

3              HEARING OFFICER BANKS:  So, what's your

4    position?

5              MR. LAMMERS:  Well, I do have notes from

6    the meeting that took place yesterday, I haven't

7    seen whatever copy DCPS would be admitting at this

8    time, so I'd want to confirm that there weren't

9    additional information or things that I didn't have

10   in the copy that I've been provided.

11             HEARING OFFICER BANKS:  So, what do you

12   want to do?

13             MR. LAMMERS:  I concede what she has.

14             MS. RODI:  There are notes, Mr. Carter--

15             HEARING OFFICER BANKS:  Only you didn't

16   provide them to him?  Did you not provide them to

17   him?

18             MS. RODI:  No, the meeting was last night.

19             HEARING OFFICER BANKS:  Your fax machine

20   doesn't work?

21             MS. RODI:  I didn't--it was after I left.

22   But there are nothing different and I know Mr.

wtk

1   Carter was given a copy an that was, actually, I

2   asked Ms. Lee [ph] what you had been given a copy

3   of.

4              MR. LAMMERS:  That seems to be everything

5   that I have.  For simplicity's sake, I won't object

6   to that being admitted.  I would point out that

'7   within our own disclosures, Exhibit 15, employees

8   erroneously included, it's actually for a different

9   student, so if you could take that out of your

10  disclosure, that won't be something that we're

11  proffering today and it's not related to the

12  Student.

13             HEARING OFFICER BANKS:  That it?

14             MR. LAMMERS:  Thank you very much.

15             HEARING OFFICER BANKS:  Both sets of

16  five-day disclosures admitted, including

17  DCPS's--what did I do with yours?  There it is.

18  Any other preliminary matters?

19             MS. RODI:  Yes, we had compelled the

20  Student and he isn't here.

21             MR. LAMMERS:  The Student is available by

22  phone, which is also how he participated in the

wtk                                                                    8

1    last hearing where his presence was required.  And

2    the note or Motion to Compel, we received

3    separately, but the disclosures don't actually list

4    him as a witness, so it would be my contention that

5    Ms. Rodi wouldn't be allowed to question him,

6    except on cross after I called him.

7              HEARING OFFICER BANKS:  Where is the

8    Motion to Compel?

9              MS. RODI:  It's attached to my disclosure,

10   it's the second-to-last page.

11             HEARING OFFICER BANKS:  Oh.  If it's not

12   it, it's the one at the other end.

13             MR. LAMMERS:  I mean, I've spoken to the

14   Student within the last half hour, he is available

15   as a witness to participate by phone.  So, one way

16   or another he can be present today.  But I'd object

17   to Ms. Rodi calling him as a primary witness when

18   he's not listed as a witness in her disclosure.

19             MS. RODI:  We--first of all, we have said

20   that we reserve the right to examine any witnesses

21   called or identified as potential witnesses.

22             HEARING OFFICER BANKS:  She did, she did

wtk

1   file a Motion to Compel and she put you on notice,

2   so I think that's sufficient.  Anything else?

3           MS. RODI:  I would object to his presence,

4   for him not being here.

5           HEARING OFFICER BANKS:  Well, if DC's

6   never going to call another witness by phone, I'll

7   accept that objection, but--

8           MS. RODI:  Well, we, it's--it would be one

9   thing if he--

10          HEARING OFFICER BANKS:  It only means to

11  be available to testify.

12          MS. RODI:  Fine.

13          HEARING OFFICER BANKS:  You want him here?

14          MS. RODI:  Well, the fact that he's a

15  19-year-old student--

16          HEARING OFFICER BANKS:  Well, he's a

17  student.

18          MS. RODI:  --right, at D.C. University of

19  District of Columbia.  And he has graduated.

20          HEARING OFFICER BANKS:  What's your point?

21          MS. RODI:  My point is that--

22          HEARING OFFICER BANKS:  Your point is to

wtk                                                                    10

1    have him available to testify, now, if D.C. thinks

2    it's important for witnesses to be present, then we

3    can enforce that uniformly.  Mr. Lammers, would you

4    like to open?

5            MR. LAMMERS:  I would, I do have one last

6    preliminary issue, though, Mr. Banks.  We have not

7    received a written response to the Complaint from

8    DCPS.  I know that's been back and forth.  I think

9    "Massey's" [ph] made it more clear, though, that

10   there's no way of substituting the obligations of

11   that written response.

12           HEARING OFFICER BANKS:  May I see?

13           MR. LAMMERS:  "Warner Massey versus

14   District of Columbia," it was a memorandum opinion

15   issued by the District Court on November 3, stating

16   that, essentially, the response is required by

17   DCPS, they're not allowed to substitute other forms

18   of the response that are required under the

19   procedural requirements of IDEA.

20           HEARING OFFICER BANKS:  Did you file a

21   Motion for--

22           MR. LAMMERS:  I have not filed a previous

wtk

11

1    Motion.  So, I'm making that Motion--

2              HEARING OFFICER BANKS:  What is it with

3    you people?  You walk in here on the day of the

4    hearing, you've got disclosures that were done the

5    day before.  Now you want me to determine the case

6    the first time I hear about it is at the hearing?

7              MR. LAMMERS:  I'm just putting it on the

8    Record as--

9              HEARING OFFICER BANKS:  There's a form

10   known a Motion to--Motion for Default Judgment,

11   should be filed sometime before I convene a

12   hearing.

13             MR. LAMMERS:  Understood, Mr. Banks.

14             HEARING OFFICER BANKS:  Was there a

15   Resolution Meeting?

16             MR. LAMMERS:  No, no Resolution Meeting

17   was scheduled by DCPS.

18             MS. RODI:  We did the MDT meeting, not in

19   lieu of--

20             HEARING OFFICER BANKS:  I'll tell you

21   what, Mr. Lammers, my practice has been where DCPS

22   doesn't file a response and doesn't convene a

wtk                                                    12

1  Resolution Meeting through no fault of the

2  Petitioner, I have granted Motions for Default

3  Judgment.  Since you didn't file one before the

4  hearing began, I'm going to take your Motion under

5  advisement.

6           MR. LAMMERS:  Understood, Mr. Banks.

7           HEARING OFFICER BANKS:  Would you like to

8  open?

9           HEARING OFFICER BANKS:  A█████

10 R███-G███████ was a student at Wilson Senior High

11 School.  He has graduated, as Ms. Rodi has pointed

12 out.  He's attending UDC, where he's having

13 significant problems taking classes as a

14 college-level student.

15           There was a previous--

16           HEARING OFFICER BANKS:  Wait a minute,

17 let's start--let's start this over.

18           MR. LAMMERS:  Sure.

19           HEARING OFFICER BANKS:  He was at Wilson?

20           MR. LAMMERS:  He was at Wilson.

21           HEARING OFFICER BANKS:  And then what

22 happened?

wtk

13

1    MR. LAMMERS:  He graduated from Wilson in

2  June, while we still had issues of services not

3  being delivered being raised through complaints and

4  settlement agreements and I will be able to offer

5  witness testimony today from Mr. Carter from A████

6  indicating the harm that he's received from this

'7  lack of services and what problems he's having

8  right now trying to move on with his education.

9         HEARING OFFICER BANKS:  Go ahead.

10        MR. LAMMERS:  DCPS was ordered to--

11        HEARING OFFICER BANKS:  So, he's actually

12 attending UDC [unintell.]

13        MR. LAMMERS:  He's attending UDC at this

14 time, taking remedial classes there.  There was an

15 Order issued on August 30, requiring an MDT meeting

16 be convened within 30 days to determine the amount

17 of compensatory education that A████ was supposed

18 to receive and to develop a plan.  That meeting was

19 not convened within the 30 days.  There is a long

20 list of letters from Mr. Hill attempting to get

21 that meeting scheduled.  The meeting was not

22 ultimately held until yesterday.

wtk

14

1      And at that meeting, despite the fact that

2  DCPS representatives admitted that there have not

3  been services provided to A▓▓▓▓ for a very long

4  period of time, required under his IEP, they were

5  still not willing to give him any compensatory

6  education whatsoever.

7      So, our issues today are the failure to

8  comply with that August 30, HOD; failure to provide

9  the Student with specialized instructions and

10  related services; and we're asking for, either a

11  meeting to be convened within five days with some

12  specific Order instruction given to the team that

13  they must provide compensatory education that would

14  include, at a bare minimum, a laptop computer and

15  appropriate software to prepare A▓▓▓▓ for his

16  college courses.  And tutorial services of

17  compensatory education to enable him to pass

18  his--the remedial classes, which, if he can't, he

19  will not be allowed to take any college courses at

20  UDC.

21      If they don't convene that meeting within

22  five days--and I'm asking this because we've had

wtk

15

1  the past three months trying to get this meeting

2  done in the first place--we would ask that he just

3  be issued, as compensatory education automatically,

4  a laptop computer; appropriate educational

5  software, which would include, at a minimum,

6  Windows XP, Office XP, Microsoft Student 2006; and

'7  that he receive 2,000 hours of tutorial services.

8         Today, I'm prepared to call Mr. Hill and

9  Mr. Carter, both who can give testimony as to the

10  meeting that was convened yesterday; the steps that

11  have been taken to try to secure compensatory

12  education through the required HOD meeting and it's

13  violation.  Also to be able to call Angelo to

14  discuss some of the problems--the specific and

15  immediate academic harm that he's suffering with

16  now, as a failure of DCPS to provide him  his

17  specialized instruction and related services over

18  the past three school years.

19         HEARING OFFICER BANKS:  I want to go off

20  the record.

21         [Break.]

22         HEARING OFFICER BANKS:  Ms. Rodi?

wtk

1        MS. RODI:  DCPS was ordered in the last

2   HOD to convene a meeting to determine--to discuss

3   compensatory education and determine what, if

4   anything Student was owed.  The team met and they

5   determined that the Student was occupational

6   therapy owed any compensatory education.

7        The notes are very extensive.  They--there

8   was nothing that said, in the last HOD that we had

9   to do anything more than to meet to discuss

10  compensatory education.  All the other issues had

11  already been adjudicated.

12       And the notes are extremely extensive that

13  talks about how the Student didn't avail himself of

14  education at times; that he--and I have Ms. Lee to

15  testify to the services that he did not avail

16  himself of, that he was not interested in receiving

17  some of his related services and that--and his

18  report card, which was also reviewed at the

19  meeting, also shows that, when he attended classes

20  at other schools that he did receive passing grades

21  and subsequently got a diploma.

22       And it was, therefore, DCPS's conclusion

1  that there was no compensatory education that was

2  needed to give to the Student.  And, today, we will

3  have Ms. Lee testify to what happened to the

4  meeting yesterday and that this meeting

5  subsequently met the requirements under the last

6  HOD to have the meeting, to have the discussion,

'7  and to determine whether or not the Student needed

8  compensatory education.

9          HEARING OFFICER BANKS:  Do you have a

10  witness?

11          MS. RODI:  Yes.

12          [Phone call placed.]

13          HEARING OFFICER BANKS:  Who is this

14  witness?

15          MS. RODI:  Ms. Lee, Sonia Lee [ph], SEC.

16  DCPS will have to rely on the documents in the

17  Record.

18          HEARING OFFICER BANKS:  No other witness?

19          MS. RODI:  The witness is--

20          HEARING OFFICER BANKS:  No, I'm speaking,

21  you have no other witness?

22          MS. RODI:  I have no other witness.

wtk

1    HEARING OFFICER BANKS:  So, you're not

2  calling the Student?

3    MS. RODI:  What's that?

4    HEARING OFFICER BANKS:  You're not calling

5  the Student?

6    MS. RODI:  No, the Student, not at this

'7  time.

8    HEARING OFFICER BANKS:  Mr. Lammers, do

9  you have a witness?

10    MR. LAMMERS:  Yes, the first witness I'd

11  like to call is Mr. Kevin Carter, please.

12    HEARING OFFICER BANKS:  What are we going

13  to establish on your side?

14    MR. LAMMERS:  We're going to establish

15  that Mr. Carter attended this meeting, yesterday,

16  where he met with Ms. Lee; where Ms. Lee and other

17  members indicated through service logs, class

18  schedules, and discussions which are now in the

19  notes that Ms. Rodi has submitted, that Angelo has

20  been denied his special-education services.  His

21  IEP has not been implemented and, basically, in the

22  entire last advisory, he was forced to choose

wtk                                                                    19

1   between whether or not he wanted to graduate or

2   whether he was--

3        HEARING OFFICER BANKS:  Okay, here's what

4   I need to know:  Let's assume you prove all that

5   and there's a violation of the previous HOD, which

6   is why we're here.  How are you going to show how

7   much comp-ed he's entitled to?

8        MR. LAMMERS:  We can show by a cross

9   between the amount of services denied, the actual

10  violations--the elements of the violation compared

11  to the harm that he is now facing at UDC, which Mr.

12  Carter has dealt with ▬▬▬▬.  And ▬▬▬▬ will be

13  called afterwards to talk about the specific--

14       HEARING OFFICER BANKS:  All the harm that

15  he's facing at UDC now, is as a result of the

16  violation of the hearing--HOD in June?

17       MR. LAMMERS:  This is one way of showing

18  some of the harm that has been the result of

19  failure to implement the IEP, which led to the

20  HOD--

21       HEARING OFFICER BANKS:  No, what we're

22  here to deal with is a violation of the last HOD.

wtk

1          MR. LAMMERS:  Yes, Mm-hmm.

2          HEARING OFFICER BANKS:  The comp-ed that

3     I'm entitled to award is on the basis of the

4     violation of that HOD.

5          MR. LAMMERS:  Right.

6          HEARING OFFICER BANKS:  So, what you're

'7    got to show is the loss that he sustained as a

8     result of the violation of that HOD and the type of

9     comp-ed that would compensate him for that loss.

10         MR. LAMMERS:  Understood, but that HOD is

11    dealing with services that weren't provided--we

12    simultaneously--

13         HEARING OFFICER BANKS:  Okay, that HOD--I

14    don't care, that HOD--I don't care.  That HOD was

15    an incorporation of a settlement agreement.  What

16    I'm here today for is a violation of that HOD.

17         MR. LAMMERS:  Actually it's for two

18    issues, we've plead two separate issues in this

19    Complaint.  One is the violation of the HOD; and

20    two is the failure to provide those services over

21    the last school years.

22         HEARING OFFICER BANKS:  There still has to

wtk

1  be a showing--I'll tell you what, you put your

2  witness on.

3         Whereupon,

4              KEVIN CARTER

5  was called as a witness and, having been first duly

6  sworn by the Hearing Officer was examined and

7  testified as follows:

8         HEARING OFFICER BANKS:  go ahead, Mr.

9  Lammers.

10              DIRECT EXAMINATION

11         BY MR. LAMMERS:

12    Q    Could I have your full name for the

13  Record, Mr. Carter?

14    A    Yes, my name is Kevin Carter, C-a-r-t-e-r.

15    Q    And your current position?

16    A    I'm an educational advocate with James E.

17  Brown and Associates.

18    Q    How long have you been with that

19  organization?

20    A    A total of three years.

21    Q    Could I have you background

22  certifications, degrees that qualify you for your

wtk

1    current position?

2        A    Sure, I have a bachelor's degree in

3    psychology and social sociology; a master's degree

4    in counseling in mental health and a National

5    Counselor's certification.

6        Q    Are you familiar with Angelo

7    Rivas-Gregory?

8        A    Yes, I am.

9        Q    Have you reviewed any evaluations that

10   were included in this disclosure?

11       A    Yes, I reviewed a psycho-educational

12   assessment that was done several years ago.

13       Q    When was that evaluation conducted or what

14   year was that evaluation provided?

15       A    I believe that was conducted in 2001, I

16   don't have it in front of me.

17       Q    For clarity, that's been disclosed as

18   Exhibit 18.  Has he received any psycho-educational

19   evaluations that you are aware of, since that time?

20       A    Not to my knowledge.

21           HEARING OFFICER BANKS:  Does the HOD in

22   June require a psycho-ed?

wtk

23

1              MR. LAMMERS:  This is going to establish

2    harm.

3              HEARING OFFICER BANKS:  No, I'm not--we're

4    not re-litigating stuff.  What--did the HOD in June

5    require an updated triennial?

6              MR. LAMMERS:  No, it did not.

7              HEARING OFFICER BANKS:  Well, let's move

8    on.

9              MR. LAMMERS:  All right.

10             BY MR. LAMMERS:

11        Q    Can we assess any grade-level assessments

12   from that evaluation?

13        A    To my knowledge, there were not any

14   grade-level designations in that psycho-educational

15   assessment.

16             HEARING OFFICER BANKS:  Do you mean in a

17   four-year-old--

18             MR. LAMMERS:  The four-year-old, I'm

19   asking to determine, basically, what the damage has

20   been--what--

21             HEARING OFFICER BANKS:  Well, it's not my

22   fault that you don't have a Record to make that--I

wtk

24

1    mean, there are ways that you could make this

2    showing, but not with a 2001 psycho-ed.

3            MR. LAMMERS:    I have additional things

4    that I'm--I just want to make sure that we've got

5    the full thing on the Record.

6            HEARING OFFICER BANKS:    Okay, there's a

7    2001 psycho-ed, that's overdue.

8            BY MR. LAMMERS:

9        Q    Have you reviewed his last IEP?

10       A    Yes, I have.

11       Q    What was the date of that IEP?

12       A    That was dated 2000, well I don't want to

13   misstate it, but it was in the Record.

14       Q    Well, I can show you Exhibit 22, if you

15   can identify if this is the Student's IEP?

16       A    Correct, May 4 of '04.

17       Q    Is this the last IEP you're aware of?

18       A    That's the last one I'm aware of.

19       Q    Can you tell me what present levels were

20   given for A▇▇▇▇ at that time in his academic

21   areas?

22       A    I rem written expression was a relative

wtk

1  spread, but I think that was a 10th grade, second

2  level; designation of reading comprehension was a

3  deficit area; again, I don't want to misstate it,

4  I'd prefer to look exactly at it, but I recall it

5  being fourth or fifth grade.

6      Q    Can you confirm that this Page 2, which is

7  included, actually, at the fourth or fifth page in

8  Exhibit 22 of this disclosure is the Page 2 that

9  establishes the present levels?

10     A    That's correct.

11     Q    Can you tell me what the present levels of

12 the math calculation and math reasoning were?

13     A    Right.  Math calculations was fifth grade

14 eighth month.  Math reasoning was fifth grade,

15 fourth month.  And reading comprehension to be

16 exact was fourth grade, fourth month.

17     Q    Thank you.  How many hours were required

18 of specialized instruction for A██████, based on

19 that IEP?

20         MS. RODI:  Objection, we've gone through

21 all of this already.

22         HEARING OFFICER BANKS:  No, let him go.

wtk

26

1  Go ahead.

2        THE WITNESS:  Twenty-two and a half hours,

3  weekly.

4        BY MR. LAMMERS:

5    Q    Have you received any service logs or

6  encounter tracking forms from DCPS that indicate

7  that A▇▇▇▇ has received any of those specialized

8  instruction over the past two or three school

9  years?

10   A    I have not.

11   Q    Did you attend any MDT meeting for A▇▇▇▇,

12  I'm sorry, for A▇▇▇▇ on November 30?

13   A    Yes, I did.

14   Q    Can you tell me what happened at that

15  meeting?

16   A    Right, the focus of the meeting was to

17  engage in discussion about whether the Student was

18  entitled to compensatory education and the basis

19  for doing that was review of the IEP that we

20  just--that you just referenced.

21   Q    Why was that meeting being convened?  What

22  was the impetus behind it?

1      A    Well, primary purpose for having that

2    meeting, was the fact that this year A████ is

3    having enormous difficulty at UDC, he's enrolled in

4    three remedial courses, was unable to take the

5    courses he would have taken as a true freshman,

6    because he could not pass the entrance exam.  And

7    because he's currently struggling in remedial

8    courses, his status as an enrollee at the

9    university is in jeopardy.  He will not be able to

10   take freshman courses until he passes the remedial

11   courses.

12      Q    Was there an Order requiring that

13   compensatory education be calculated?

14      A    At that meeting?

15      Q    Right, was this meeting in response to an

16   Order?

17      A    Yes, it was.

18      Q    That Order has been included as Exhibit 5

19   in the disclosures.  Have you seen this Order,

20   which I'm now showing Mr. Carter?

21      A    I have not seen it.

22      Q    Can you read section 1

wtk

28

1          HEARING OFFICER BANKS:  It speaks for

2    itself.

3      Q    Well, then to clarify the meeting was to

4    discuss and determine the amount of compensatory

5    education due and develop a compensatory education

6    plan.  Why wasn't this meeting held within 30 days?

7      A    Ms. Lee, the special education coordinator

8    at Wilson, insisted that the meeting could not go

9    forward if the Student were not physically present.

10   We had talked about--we had tentatively scheduled a

11   previous date and I had inquired about whether or

12   not the Student could participate by phone, but Ms.

13   Lee advised me, because of the Student's age, that

14   it was imperative that he be present at the meeting

15   in order for it to go forward.

16     Q    Were any of these meetings or this initial

17   attempt scheduled within the 30 days the Order

18   required?

19     A    No, they were outside of the date.

20     Q    Was Ms. Lee aware at anytime that your

21   firm wanted service logs, something to indicate

22   what services that he'd been receiving over the

29

1    past two or three years?

2        A    I know I had expressed that in at least

3    one of our conversations and it's my understanding

4    that a letter had been forwarded from our firm

5    requesting those documents, as well.

6        Q    Did you have any service logs prior to the

7    meeting yesterday?

8        A    I did not.

9        Q    Once you received some service logs, did

10   any of them indicate that he had been receiving

11   specialized instruction per his IEP over the past

12   few years?

13       A    No, it didn't.

14           HEARING OFFICER BANKS:  I'm sorry, I think

15   I've--you're saying that Ms. Lee refused to go

16   forward with a meeting without Petitioner?

17           MR. LAMMERS:  This was an initial meeting,

18   this wasn't the meeting yesterday.

19           HEARING OFFICER BANKS:  Right, and when

20   was that?

21           MS. RODI:  I believe that had originally

22   tried to be a Resolution Meeting.

wtk

30

1          BY MR. LAMMERS:

2      Q    You received no scheduling for a

3   Resolution Meeting?

4      A    I'm sorry, November 7.

5          HEARING OFFICER BANKS:  So, is there an

6   Exhibit relating to that?

7          MR. LAMMERS:  There is an exhibit 18,

8   which memorializes the conversation that took--I'm

9   sorry in Exhibit 17, which memorializes the

10  conversation Mr. Carter had on the 17th, when he

11  attempted to have this meeting at Wilson with Ms.

12  Lee.  And why she refused to convene the meeting,

13  even though the Student was available.

14         HEARING OFFICER BANKS:  All right, go

15  ahead.

16         BY MR. LAMMERS:

17     Q    Earlier it was commented that there was a

18  meeting scheduled for the 22nd, do you remember any

19  meeting being scheduled with your for November 22?

20     A    I don't remember any meeting being

21  scheduled.  Ms. Lee had talked about that date as a

22  tentative date, but, again, her insistence was

wtk

1   that, in order for the Student--in order for the

2   meeting to go forward, the Student would have to be

3   present physically. And at the time of that

4   conversation, I indicated I had not been successful

5   in establishing phone contact with the Student.

6       Q   What was shared with you at the meeting,

7   outside of the service logs available as far as

8   what specialized instruction A██████ has received

9   over the last three years, per his IEP?

10      A   Well, the questions I had pertained to,

11  first of all, whether or not the instructors he was

12  assigned to were duly certified. And Ms. Lee

13  attempted to inform me about those instructors that

14  she knew personally as she just recently assumed

15  the position of coordinator, herself. So, she was

16  not able to answer my inquiry about the

17  certification about some of the instructors. And

18  the other concern I had pertained to those offers

19  in which it was clear by Ms. Lee and by the

20  Student's testimony that the instructors were not

21  duly certified, they were regular-education

22  teachers and my questioning there had to do with

wtk

1    how could the Student have received specialized

2    instruction.

3        The third concern had to do with Ms. Lee's

4    admission that during the last advisory, the

5    2004/2005 school year, the Student only received

6    specialized instruction in a world government

7    course and that the Student had been put in the

8    situation with respect to amassing credits such

9    that his course schedule was stacked with elective

10   courses and Wilson could not provide him with

11   specialized instruction, except in world

12   government.  And the concern I expressed had to do

13   with the IEP being a legal document and intractable

14   in the sense that the school was obligated to

15   provide specialized instruction unless the team

16   assembled and decided to amend the number of

17   specialized-instruction hours.

18       Q    So, if I understand correctly, then, in

19   the fourth advisory, alone, only one class was

20   offered to A██████ that had any specialized

21   instruction?

22       A    That's correct, according to Ms. Lee.

wtk

33

1        Q    And that class was world government.  How

2    many hours would that have accounted to, even if he

3    received all those specialized-instruction hours?

4        A    That would have been from March 24 through

5    the end of the school year, which Ms. Lee said into

6    June 7.  So, minus the spring break, we're looking

7    at about ten weeks and four and a half hours of

8    instructional time per week.

9        Q    So, at best, out of all the specialized-

10   instruction services he should have been given,

11   based on his schedule, he only could have received

12   44 hours?

13       A    Right.

14       Q    At a maximum?

15       A    Correct.

16       Q    Was there any discussion at this meeting

17   about his English class or English 2, in

18   particular?

19       A    There was, Ms. Lee was forthright and

20   acknowledged the fact that A━━━━━━ instructor in

21   his English 2 course, which he took during the

22   2002/2003 school year was a regular-education

1   instructor, not duly certified.  And, again, she

2   acknowledged it--she conceded that he did not

3   receive the specialized instruction in that course

4   for the entire year.  Subsequently, ended up

5   receiving an F in the course and had to go outside

6   to the Roosevelt Stay program to retake it in order

7   to be in a position to graduate.

8       Q    But his English or, I'm sorry, his reading

9   skills were still listed in that IEP as being in a

10  sixth-grade level, I believe.

11      A    Fourth-grade level, actually, reading

12  comp, I think was 4.4.

13      Q    Four-point-four, thank you.  Now, so,

14  basically, at this meeting, they clarified that he

15  didn't receive any specialized-instruction except,

16  possibly, this one class integrated he fourth

17  advisory.  They did share with you that he didn't

18  have any specialized instruction for this English 2

19  class, one of the areas that he has weaknesses?

20      A    Correct.

21      Q    Were they able to provide you and, once

22  again, any service logs that indicated during other

1  advisories that he had been receiving the

2  specialized instruction he was supposed to have in

3  the IEP?

4      A    They were not able to provide those

5  service logs.

6      Q    Did the team agree, since we have--with no

7  service logs, thousands now of hours missed or not

8  confirmed--did the team agree on any amount of

9  compensatory education that they were willing to

10  provide?

11      A    No, the team disagreed.  I--and the

12  Student disagreed with Ms. Lee and Miss Linear

13  [ph], one of the instructors in attendance that he

14  was not entitled to compensatory-education hours,

15  based upon their claims.  And we kind of rehashed

16  the information that they had provided us with on,

17  at least three occasions.  And we still disagreed

18  about that.

19      Q    They didn't provide you anything that

20  indicated the IEP had been amended, that the

21  Student had signed or anyone had signed anything

22  that said that these are the hours that had been

wtk

36

1    provided?

2        A    They did not.

3        Q    Now, was--these fourth-advisory classes,

4    these electives, were they selected randomly?  Was

5    there any purpose that these particular classes

6    were in the fourth advisory?

7        A    I don't know what the selection process

8    entailed, but Ms. Lee indicated that the Student

9    was in a position that would have prevented him

10   from graduating, had he not loaded his schedule

11   with electives.  And, again, my concern was, given

12   the Student's glaring deficiencies, how could it

13   have been that he was put in that position?  He

14   needs specialized instruction.

15       Q    Why couldn't--if he'd gotten specialized

16   instruction in these other classes other than

17   history?

18       A    Another question I had to Ms. Lee at the

19   meeting yesterday, there were, among those

20   electives, a few courses which certainly would have

21   had some academic content and in those courses, I

22   inquired about whether someone from the special-ed

wtk

37

1  department could have gone into the classroom,

2  worked collaboratively with the instructor to still

3  try to bolster some of those skills in areas of

4  deficit.

5      Q    What was their response?

6      A    She said that she could not answer to

7  that, that she had just taken over the special-ed

8  coordinator position last spring.  And that if the

9  Student had really felt he needed help, he could

10  have gone and asked for help.

11          And, again, I responded that those

12  instructional--specialized instructional hours were

13  not a function of a Student's volition, they should

14  have been provided per the IEP.  He should not have

15  had to go an ask for help that should have been

16  made available to him.

17      Q    So, if I understand, Ms. Lee's position

18  was he should have asked or he should have gone

19  above what the requirements of his IEP to ask for

20  additional services?

21      A    She felt he should have gone and asked for

22  help if he felt their help was not sufficient.

wtk

1    Q    What's A████ doing now for his education?

2    A    Again, he's enrolled in the University of

3    the District of Columbia, according to him in three

4    remedial courses.  And struggling mightily.  He,

5    yesterday asked me about what will happen if he

6    does not pass to the grant money that he's

7    obtained.  And I, obviously, couldn't answer that,

8    but he says he needs all the help he can get and

9    he's at great risk for not passing these courses.

10    Q    So, is he not allowed to move on to a full

11    college curriculum until he's passed these courses?

12    A    He can't, until he passes the test at the

13    conclusion of each of the remedial courses, he'll

14    not be able to move on to a true freshman

15    curriculum.

16    Q    And if he doesn't pass these classes then,

17    not only is he not allowed to move on to a true

18    freshman curriculum, but he's potentially risking

19    the loss of grant money that would allow him to

20    continue in college?

21    A    I'm not certain, I would assume so.

22    Q    Okay.  Would you say that any of these

wtk

1  problems could be extending from him not getting

2  appropriate services in school, while he was

3  attending Wilson in the areas of these remedial

4  classes?

5        MS. RODI:  Objection.

6        HEARING OFFICER BANKS:  What problems are

7  you talking about?

8        MR. LAMMERS:  Having problems passing his

9  remedial classes, being required to take remedial

10  classes before he can move on to a full college

11  curriculum.

12        HEARING OFFICER BANKS:  Sustained.

13        MR. LAMMERS:  Okay.

14        THE WITNESS:  Undoubtedly--

15        MS. RODI:  Objection.

16        MR. LAMMERS:  No, the objection was

17  sustained.

18        THE WITNESS:  Oh, I'm sorry, excuse me.

19        MR. LAMMERS:  I don't have any other

20  questions for you at this time, Mr. Carter.

21              CROSS-EXAMINATION

22        BY MS. RODI:

wtk

1      Q      Mr. Carter, at the meeting, yesterday, did

2  the teachers express the fact that A▓▓▓▓ did not

3  attend classes?

4      A      They did say that there were classes that

5  he would not attend on a regular basis.

6      Q      Did they say that he, specifically, chose

7  to go to the Roosevelt program?

8      A      They didn't say that, he said that he went

9  to the Roosevelt program because he'd gotten an F

10 in the English 2 course and he wanted to graduate

11 in a timely fashion, so he wanted to take it

12 elsewhere.

13     Q      How did he do when he went to Roosevelt?

14     A      I know he passed the course, I don't know

15 the particular grade he got, I know it was, at

16 least, a satisfactory grade.

17     Q      Looking at the report card, which is under

18 DCPS 1, what were his English grades at Roosevelt?

19     A      No, that's Parker.

20     Q      No, it's the bright one, Roosevelt.

21     A      Oh, okay, I'm sorry--he got a D, excuse

22 me.

wtk

1        D    He got a D and, then, what did he get in

2    the other classes?

3        A    Earth science was a C grade; and, then,

4    English 4, was an A-minus.

5        D    So, he went from an F and then was managed

6    to pull it up to an A-minus, is that correct?

7        A    Apparently so.

8        HEARING OFFICER BANKS:  I'm sorry, I

9    thought you said he got a D in English?

10        MS. RODI:  He had two English classes,

11    one, that English 2 he went and got a B and then

12    English 4, he went and got an A-minus.

13        BY MS. RODI:

14        Q    Isn't it true, yesterday, that you

15    discussed that he did not want to attend

16    counseling?  Hold on.

17        [Technical interruption.]

18        BY MS. RODI:

19        Q    Did he, at some point refuse to

20    participate in counseling?

21        A    Ms. Lee asked the Student that at the

22    meeting yesterday and he said there were times that

wtk

42

1    the counselor would want to see him and he would

2    not attend counseling.

3        Q    Did A_____, while he was in school, want

4    to get his diploma?

5        A    It's my understanding, he's always wanted

6    to graduate, receive a diploma.

7        Q    He did graduate with a high-school

8    diploma, is that correct?

9        A    He did.

10        MS. RODI:  No further questions.

11        HEARING OFFICER BANKS:  Mr. Lammers?

12            REDIRECT EXAMINATION

13        BY MR. LAMMERS:

14        Q    Mr. Carter, in relation to the question of

15    absences, can you tell me if ED is part of the

16    classification for A_____?

17        A    Yes it is.

18        Q    The school is aware of that?

19        A    Yes, they are.

20        Q    Is that attached to his IEP?

21        A    Yes.

22        Q    All right.  I know that there was a

wtk

43

1    discussion in particular related service

2    counseling; at this meeting, was A▮▮▮▮ also or did

3    he make any statement or was any statement made

4    that he didn't want specialized instruction?

5        A    No, he never represented that.

6        Q    Understanding--your understanding is that

7    A▮▮▮▮ wanted to graduate, was A▮▮▮▮ put in a

8    position or does it seem that he was put in a

9    position where he could have both his specialized

10   instruction and graduate?

11       A    Let me make certain I understand your

12   question, could you reframe it?

13           HEARING OFFICER BANKS:  If he took all the

14   specialized instruction--

15           THE WITNESS:  Right.

16           HEARING OFFICER BANKS:  --last year, could

17   he have graduated in June?

18           BY MR. LAMMERS:

19       Q    According to what your understanding from

20   that meeting was?

21       A    Oh, absolutely.

22           HEARING OFFICER BANKS:  How is it

wtk

44

1   absolutely if he had to go to Roosevelt to gain

2   credits?

3           THE WITNESS:  So, you're saying, had they

4   provided the specialized instruction as they should

5   have?

6           HEARING OFFICER BANKS:  I'm saying, was it

7   possible for him to get a diploma of graduation,

8   not a certificate of attendance, but  diploma of

9   graduation had he gotten the specialized

10  instruction--

11          THE WITNESS:  Oh, no.

12          HEARING OFFICER BANKS:   --required under

13  the IEP?

14          THE WITNESS:  No, his graduation would

15  have been delayed.

16          MR. LAMMERS:  Thank you, very much, no

17  further questions.

18          MS. RODI:  I just have one more question.

19                    RECROSS-EXAMINATION

20          BY MS. RODI:

21      Q     Did they give you any service logs

22  yesterday?

wtk

45

1      A    I got a few service logs and a report

2   card, and that's pretty much the gist of it.

3           MS. RODI:  Thanks, no further questions.

4           THE WITNESS:  Tracking forms, I'm sorry,

5   you said service logs.

6           HEARING OFFICER BANKS:  Tracking forms.

7   All right.  My question is, if he didn't get a

8   diploma could he have enrolled at UDC?

9           THE WITNESS:  That is a question, I can't

10  answer, I don't know.

11          MS. RODI:  I believe if you need a

12  high-school diploma to enroll in UDC.

13          HEARING OFFICER BANKS:  So, here's where

14  we are:  You're here complaining that he's having

15  trouble at UDC because of services he didn't get,

16  i.e., specialized instruction.  But if he'd gotten

17  specialized instruction, he wouldn't have gotten a

18  diploma and he wouldn't be able to go to UDC,

19  anyway.

20          MR. LAMMERS:  Well, practically speaking--

21          HEARING OFFICER BANKS:  So, which do you

22  want?